United States Court of Appeals for the 11th Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning and welcome to the third day of the 11th Circuit sitting virtually in Miami. Judge Newsom, Judge Marcus, and I greatly appreciate everyone's If we experience technical difficulties during the arguments, please be patient. Our IT team will take care of it and will ensure that you get the full time and the full opportunity to argue. You should see on your screen a timer in green color. The green means that you may proceed with your argument when I tell you to begin. The light will turn yellow when you have two minutes remaining in your argument and then when it turns red we ask you quickly conclude your remarks at that time. Counsel, before you begin your arguments, please be advised that we have read your briefs, we've read the important parts of the record, and we are fully familiar with your cases. So feel free to go right into the heart of your arguments. Let's begin. Our first case is number 19-13692, which is Harris and Archibald, Ms. Litwin, you may begin when you're ready. Thank you. Good morning and may it please the court. Ashley Litwin on behalf of James Archibald. This case is about an entrapped rookie police officer threatened by his only contact. He was found guilty of two of the five counts and sentenced to the minimum mandatory of 10 years because the jury was not instructed on any legal way to find Mr. Archibald not guilty. James Archibald, a rookie police officer, was picked not because he ever did anything illegal but because he was known as a hard worker and he was entrapped by the withholding of information to get him to show up on September 28th, keeping him in the dark until after he had already unwittingly committed a drug deal and was sitting in a car with not one but two, well inside were two supposed drug traffickers, two other drug traffickers were sitting, supposed drug traffickers were sitting outside, and then the government allowed his only contact to remain to be an unmonitored senior police officer who the government had recorded threatening his life. He was given no opportunities to back out before October 11th and then even though the uncontra- even though, sorry, he was given no opportunities to back out even though the uncontroverted evidence shows he didn't want to be there on October 11th. He showed up over an hour and a half late. He seemed, the CI even said he seemed scared and very uncomfortable to the point where the CI is talking to the other defendants about how scared Archibald seems, which is where these threats on his life become, and he tried to stay in the car during the drug deal until he was forced to get out by Sean Tom Harris. Yet because of there were two important instructional errors here, which is the reason that he was found guilty, either one of these instructions had been given, it would have resulted in an acquittal. So first, there's the duress instruction and second, the court's supplemental instruction to the jury, which confused the jury as to entrapment, which is where I'd like to start my- Before you leave the issue of duress, good point with respect to the count on that occurred on October the 11th, but I'm not so the government's argument that there were no immediate threats when Mr. Archibald agreed to join the conspiracy, and he presumably had time and space in which to escape or report. So why don't you talk about that charge? Sure, your honor. He wasn't threatened immediately on September 28th. I don't think that the committing of the crime on September 28th was based on duress. It was based on entrapment at that point, which is why he was acquitted of those counts, based again on the response to the jury's question on entrapment that the court gave is the reason that the jury could not find him, could not acquit him of entrapment on October 11th, based on entrapment on October 11th, because the instruction confused the jury as to that. The duress instruction was really limited only to the October 11th incident, which is why the jury found him guilty of conspiracy. They acquitted him of everything that happened on September 28th. So giving the duress instruction, which is showing why he showed up on October 11th, would have acquitted him not only of October 11th, but then the jury most likely would have acquitted him as to the conspiracy as well. Ms. Ledwin, I have a question for you. As I understand your challenges, you say there was something wrong with the initial instruction given on entrapment, and then the district court erred a second time in so far as she answered a question in a certain way. As for the first thing, was there an objection to the entrapment instruction she gave, the initial one? Yeah, your honor, I'm not actually raising any issues with the initial entrapment instruction. The original instruction was the standard instruction, and you have no quarrel with that. No quarrel with that. Your quarrel is with the second answer that she gave to the question the jury put, right? Yes, your honor. Why don't you tell us why? Sure. So the jury question on entrapment told the court that the jury was confused as to how to deal with these two drug transactions and entrapment, because obviously the inducement happened prior to September 28th or on September 28th. There was no second inducement or anything that happened prior to October 11th that would have separately entrapped him on October 11th, and so therefore the jury was confused. How does it deal with both of these things? The court's response, the question from the jury asked, can we apply the definition of entrapment as to each date count, or is it one decision based solely on the initial date of contact for each defendant? And over objection, the court instructed that each count of the superseding indictment charges a separate crime. You must consider each crime and evidence relating to it is inappropriate in Isnadine, which was a completely different set of facts. But what the footnote in Isnadine said, and the footnote in Brown, and Beal and Slaughter, which were discussed in the footnote in Isnadine, said that in cases like this, where there's extraordinary inducement, so where the government does much more than just offer an opportunity to see if a defendant wants to engage in a drug transaction, and there's a series of similar transactions that deal with the same players within a short span of time, that in those instances, a supplemental instruction, in those instances, the temple timeframe is confusing, and that there can be continuing entrapment in those cases, which is why this instruction in this particular case, where it hit all of those factors, was incorrect. I see that I've moved to red light, so. You may begin already, counsel. Thank you, ma'am. Please support. Good morning. My name is Roger Green, and I represent Appellant Kelvin Harris. I raised, I reserved three minutes for my rebuttal, and I've raised four issues in this case. Issue number three dealt with the improper jury instruction. I'm abandoning that particular issue. I've researched it sufficiently, and I concur that the court gave the proper jury instruction with regard to that issue. But what I would like to address first is the lower court's denial of Appellant's Rule 29 motion for judgment of acquittal. And what I want to specify is that during this trial, the court advised counsel that the Rule 29 motions were going to be reserved until the evidence in the case. Both defendants testified and rested their cases. Appellant then moved for judgment of acquittal. However, when Appellant moved for judgment of acquittal, his counsel simply stated that the government failed to prove knowledge as to Count 1, that the evidence was insufficient as to Counts 3, 5, and 7 to establish that Appellant had a gun. As to Counts 4 and 6, they argued that the evidence was insufficient to prove knowledge more than a detectable amount of cocaine. Appellant's motion for judgment of acquittal as to Count 2 was inadvertently omitted. Now, Appellant previously filed a motion to dismiss the indictment based on outrageous governmental misconduct. That motion was denied. But that motion was also filed before Appellant was given a copy of the grand jury testimony of the government's main witness against him, who was Katina Anderson, a former officer who was allowed to testify before the grand jury and make numerous material false statements about Appellant, which resulted in Appellant being indicted. And what is most troubling about Katina Anderson's testimony before the grand jury is that the government was aware that she was testifying falsely and allowed her testimony to go uncorrected. And this court in the United States... Mr. Green, Mr. Green, Katina Anderson testified at trial that her testimony before the grand jury, the part that was incorrect, may have been confusion. Given this testimony, how can we say that she committed perjury, which requires that false testimony is not the result of confusion? Well, when Ms. Anderson testified before the grand jury, she was questioned about several events, several things concerning Mr. Harris knowing the contents of containers that were taken from the Greyhound. She indicated in the grand jury testimony that he was aware that he had been cocaine. She also testified that on October the 11th, 2018, before the grand jury, that Mr. Harris helped offload two containers of cocaine at the marina. However, when she testified before the jury, she then stated that she never made those statements. That's what she first stated, that she did not make those statements. Not that if she made them, it was a mistake. She said she did not make the statements. When it was brought to her attention, she said she doesn't know why the transcript reads that way, because that's not what she said, because they never made it to the marina. And so Mr., well, the prosecutor at that time knew before the grand jury, and this is what's most important. He knew at the time that she testified before the grand jury, when she made the statement that Mr. Harris is present at the marina, he went back and he questioned her. He says, oh, so are you saying you were there? And she says, yes, we were there. We were parked right in back. Mr. Harris got out of the vehicle. He went to offload the cocaine from the boats and assisted Shantan Harris with putting the containers inside of her vehicle. Now, the prosecutor knew that was not the case because he knows his case better than anyone. And he knew that's not what the agents had advised. But nevertheless, he allowed that testimony to go uncorrected before the grand jury. Now, I'm not talking about what went uncorrected for the trial, but what went uncorrected before the grand jury. And so when Ms. Anderson testified, Judge, when Ms. Anderson testified before the grand jury, these were the statements that she was making. She would testify that Mr. Harris had firearms on this person. She would testify that Harris was aware. Mr. Vereen, can I ask you just one question about this? Doesn't the Pettit jury's verdict of guilty render harmless any conceivable error in the charging decision that might have flowed from the purported violation? The Pettit jury finds the defendant guilty beyond a reasonable doubt. And doesn't that vitiate any claimed error that might have occurred in the grand jury? I would say I would disagree. Well, with respect for your honor, I would say the answer to that is no, because this court has stated that if there is prosecutorial misconduct before the grand jury, that is a basis to dismiss the indictment, regardless of what takes place after the fact. If this court finds that there was grand jury abuse and that the prosecutor acted in bad faith, that there was prosecutorial misconduct and can establish that, then the proper remedy, as this court has stated, is to dismiss the indictment. And so that's the position I think that this court is in. If this court believes that the prosecutor was aware that at the time Ms. Anderson was testified before the grand jury and providing false testimony that they knew was The reason I raised the question is what the appropriate remedy might be. If there was prosecutorial misconduct, there's ample ways to deal with the misconduct. But if a Pettit jury, after considering all of the evidence and having fully heard your exploration about the of all of that, and finds the unreasonable doubt, the guilt of the defendant, and if the evidence is otherwise sufficient to sustain the jury verdict, I'm curious why the appropriate remedy would be to vacate the conviction in this case. Well, that's what this point is. Even accepting, because if you look at the kinds of misconduct we're talking about, here the claim is Anderson misled the grand jury. Maybe that vitiated probable cause, maybe it didn't. But if a jury, if a Pettit jury finds guilt beyond a reasonable doubt, it seems to me that undermines any concern about the sufficiency of the evidence establishing probable cause and where you have fully explored and effectively explored the inconsistencies in Anderson's trial, the jury was fully able to factor all of that in. Why is the right remedy to set aside the conviction? And I suppose what you're saying is the indictment should be dismissed as well. That's a tall order and it's not clear to me that that's the right remedy. Your Honor, let me try to equate it with another situation. Say, for instance, a police officer stops the vehicle or conducts a search that is determined to be an illegal search. And it is without probable cause, without reasonable suspicion, the officer just conducts a search and he finds drugs. And the defendant raises the challenge that this was an illegal search. And the court determines that, well, it was not an illegal search and would allow it to go forward. The defendant is then convicted based on the jury's assessment of the evidence in the case because drugs were found. It goes up on appeal. The Court of Appeals, I do not believe that will state that, well, he had drugs. See, I agree. I see. I agree with that. But I think the more appropriate analogy might be if a prosecutor knowingly suborned perjury before a pettit jury, seems to me the argument to vacate the conviction would be more compelling. But in this case, everything was presented to the pettit jury. And your argument all goes to misconduct in the grand jury, not before the pettit jury, if I have it right. That at least is the question I'm wrestling with. I understand, Your Honor. It seems I'm out of time. But you can answer me if, you know, if you'd like on that point. I would, Your Honor. This court has ruled before that there's grand jury abuse and it is substantial and it substantially affects the rights of the defendant or the appellant. Then the proper remedy is to dismiss the indictment. I believe that is the case that's generally come up before there's a trial. There's a claim that there was improper conduct in the grand jury, not after you've had a full trial on the merits and all of the evidence has come out. One final question. Is there any claim on your part that the prosecutor in this case suborned perjury at the trial, that the prosecutor knowingly presented false testimony to Anderson? Well, I believe that what he did at the trial level, that he allowed Anderson to make to testify during cross examination. She had made statements that he knew were false statements and he never corrected her statements. He never advised the court during that period of time. Thank you very much. Thank you, Your Honor. Thank you, Mr. Marine. You'll have your full three minutes for remodel because you are answering the court's questions. Thank you, Judge. Mr. Parker. Good morning. I'm a lawyer. I'm a lawyer in the United States. I'd like to begin just very briefly where Mr. Marine left off with the grand jury claim. I think it's important to remember a few things. One is this claim is reviewed for plain error. Harris never moved below to dismiss the indictment on this ground. And there really is no substance to it. If you look at Miss Anderson's grand jury testimony, she was obviously confused about what happened at the marina versus what happened at the Marriott Hotel about an hour later. She was answering a question related to the marina, but she was explaining the events at the Marriott. Now, Miss Anderson said immediately before that, that she was quite confused because there were so many operations and there were so many dates. Now, would it have been ideal for the prosecutor immediately to correct this? Yes. I do think that the prosecutor was also a bit confused about what exactly happened when, but the main point is at the end of the day, it just doesn't matter. For one thing, it doesn't matter for the grand jury's purposes, whether Calvin Harris handled a cooler full of what he thought was cocaine at a marina or at a hotel parking lot shortly thereafter. It also doesn't matter because there was an enormous amount of other evidence put before the grand jury, including lengthy testimony by the case agent. And Judge Marcus, as you pointed out at the end of, after the trial, the pettit jury heard all of this evidence. Katina Anderson was cross-examined extensively on it. And the pettit jury convicted Mr. Harris beyond a reasonable doubt. And as this court and the long way toward curing any possible error before the grand jury. Let me press that point a little bit further with you, Mr. Parker. Let's assume hypothetically, and I'm not suggesting that's the case here one way or the other, but let's assume hypothetically that a prosecutor knowingly presents or allows to be presented false testimony from a critical witness in the case. And the case goes to trial. And all of this comes out. Is there any remedy for knowingly suborning perjury in a grand jury that the judge has? If the prosecutor knowingly suborned perjury in the grand jury, but it was not a, if it was related to a material matter that actually could have affected the grand jury. I'm suggesting the witness itself is a very important witness. Yes. I think under the Supreme court's decision in bank of Nova Scotia, the appropriate remedy there would be dismissal of the indictment. No, no, but let's assume it only arises post trial. Oh, I see. I mean, I think there. What's the right remedy? Can a pettit jury completely vitiate subornation by a prosecutor in the grand jury? I don't know that it, that it can. I mean, the court discussed this in bank of Nova Scotia, which was decided shortly after its decision in mechanic, which is the one that established this idea that the pettit jury can cure problems for the grand jury. And it said in circumstances where the prosecutor knowingly supports perjury, and it was prejudicial and the defendant would never have been indicted. But for that, the appropriate remedy may be dismissal of the indictment. And I think even if, even if there's, even if the evidence is sufficient to establish guilt beyond a reasonable doubt, because jury has so found. Yeah. I mean, I do think that in bank of Nova Scotia, the Supreme court was thinking about some supervisory role that courts may play in ensuring the integrity of the grand jury process, even though. Admittedly, the answer would be, it would have to fall into some kind of supervisory category. I think, I think it would. Now, I don't think this will always be the case. And I think that every case is unique on its facts, but I would say that if you had a clear cut case where a prosecutor had suborned perjury on a matter that clearly led to the I think that you probably could have the dismissal of an indictment in that circumstance. You would have to concede that it would be powerful prophylactic reasons for a court to say that. Yes. Yes. The defendant isn't in the grand jury room. The grand jury here is essentially only one side of the story. Correct. The adversarial system won't begin until after reason. If indeed I prosecute, I have no only suborn perjury in a grand jury, a batter about a matter of considerable materiality. Yes, I would. But what the court would have to do is then vacate a conviction where the evidence was otherwise sufficient for the pedigree. And all of these have been fully aired before the pedigree. That's why I'm asking you this question. I'm not suggesting that the evidence establishes here the knowing subornation of perjury, nor that Anderson's testimony, even if it was false, as opposed to confused, amounted to the totality of what the jury heard. Well, I think again, I think in that circumstance, though, first of all, one would assume that the district court would dismiss the indictment before it even gets to trial. But if it then came up on appeal, the question would be whether the whether the denial of a motion to dismiss the indictment pretrial was was valid or not. And in that circumstance, it might be appropriate. And courts of appeals have generally said that this may be one of those rare cases when it is appropriate not to look at what the pedigree found, but instead to look solely at what the grand jury what happened before the grand jury. Last question that I have for you. Was any of this raised before the district court at any point during the trial after the trial before the sentence at the sentence after the sentence? Was there anything raised before the district court about false testimony presented to the grand jury? And that's a basis to vacate the conviction or even to dismiss the indictment? No, no. The the claim was raised that she had testified falsely, but that was raised for impeachment purposes, not as any ground to do so. I understand that. I just want to know if they moved to dismiss the indictment or otherwise vacate the conviction before the district court. No, they did not. Thank you. So turning now to Mr. Archibald's claims, I believe that there are two that were raised by Ms. Litwin. One was duress and the second was entrapment. Just quickly on the duress theory, the main problem here is that Mr. Archibald was engaged in these this criminal conduct for nearly a month from the very latest, September 28, all the way until October 23. And the idea that he, a police officer, had no opportunity during that time to alert law enforcement or otherwise get himself out of the situation simply is not credible. And the district court was not required to find it credible. I would note just a couple of things in his own testimony that highlight this. He testified and told the FBI in his post-arrest interview that he considered going to internal affairs after the September 28 and October 11 events. He did not. He testified that he now understood that he could have gone to the FBI or state law enforcement. He did not. And perhaps most tellingly, when asked at trial, you know, what was your game plan? Were you planning to just continue committing crimes indefinitely? He said no. That if Shantan Harris had come back to him and asked him to commit further offenses, he would have refused, which I think shows more than anything that he understood that he had opportunities to withdraw. Even with respect to October 11, which is that that the one drug trafficking operation when he was in the car with Shantan Harris and claims that she threatened him, which by the way, there is a great amount of evidence at trial suggesting that she did not. And in fact, the district court at sentencing found that when Archibald said that it was perjury. But even assuming that that was true, he was not at Shantan Harris's house for most of the day. He could have done anything during that time. During the operation, he was left in the car alone for about five minutes, according to him. He never called 9-1-1 or did anything there. At one of the hotels, he left the room while Shantan Harris was still there and was gone for a couple of minutes, then didn't do anything. And then, of course, after the drugs had been delivered, but before he'd been paid, he left for several hours and then came back to Shantan Harris's house to collect his four thousand dollars and engage in a lengthy and apparently very friendly conversation with Shantan and Katina Anderson, in which Archibald marvels about how they're letting them put their hands on the product now. It shows that their level of trust is high, how they're making more money. He discusses the importance of not having a paper trail, keeping their circle small, what they might do if they were ever caught. Mr. Parker, we said in our published opinion in Mayweather that if there's any evidence to support duress instruction, however weak, it has to be given. So it sounds to me like a lot of your arguments are going to the credibility or the strength of the evidence. Well, but I, I know. I think the point here is the district court allowed Archibald to testify to all of this and said that it would reserve decision on his duress defense. And so the district court was able to the point is not that he said I wasn't able to seek help. The point is he actually said that he was able to seek help. And the other evidence showed that that was true. I don't think that there is any testimony in the record at all that would indicate that he was unable during all of the period that he was apart from Shantan Harris during the conspiracy or on October 11th to seek assistance. And that's why the duress defense was properly fused. Turning now to let me ask you one more question about that. Mr. Parker, you, you agree, and I believe Ms. Litwin agrees as well, that it's an objective test for whether the elements of duress are met. Isn't that right? Correct. Do you agree that we can take into account though, the particular circumstances in which Mr. Archibald found himself on October 11th? It is though, what you would ask is what a person of reasonable firmness in those circumstances, how would that person react? So I think here it is appropriate to say, how would a reasonable police officer react in these circumstances? I don't think it's a stretch to say that a reasonable police officer would understand that they had opportunities to blow the whistle on serious criminal conduct that they were observing. So, so applying that test here, we can account for the fact that Mr. Archibald was relatively new on the force, can we? I mean, I possibly, I do want to note just as a factual matter, he's not a rookie. I know that that was said multiple times in the briefs, but he had been on the force for two and a half years. It's not quite as long as some of the other members of the conspiracy, but he was actually training other officers at the time he was arrested. What about the fact that officer Harris was senior to him? Can we take that into account? I mean, I think you could though officer Harris, although senior in the sense of having been on the force longer, she was not as commanding officer. She had no control over him whatsoever. She simply provided him with an opportunity to guard and then transport drugs. And he took it and made a lot of money and never returned that one. And Mr. Harris, the defendant was also senior to him. Isn't that right? Yes. Yes. Although Mr. Harris was suspended or had been relieved of duty. So he was not actually serving officer at the time. We have, we have evidence that seems to me that officer Harris was actively threatening Mr. Archibald in the days before and actually during the events. And we need, we have to view the evidence in the light that was favorable to him. So explain to me in the context of that day, that night, when he had a reasonable opportunity to escape or report. By that day, do you mean October 11th? Yes. Yes. So the, the argument has been that on that day, Shantan Harris threatened him three times. First in three times in the car, each time she said, if you, if you keep your lips sealed, if you tell anyone you'll disappear or, or your family will disappear, something to that effect. None of that happened though, until they were already in the car. Archibald had already showed up. He, even he didn't say that she threatened him before he arrived. While he was in the car at the Marina, he claims that he was forced to get out. I don't think that the evidence bears that out. It just shows that he stayed behind in the car, but he was in the car for five minutes, according to him. And he never once did anything. Then at one of the hotels after Archibald had watched the cocaine be unloaded on the bed and had engaged in very friendly banter with a person he thought to be a drug trafficker, including giving him a hug. Mr. Archibald left the room and Shantan Harris stayed behind and talked with the drug trafficker. Archibald didn't do anything there. Then when they were done delivering the drugs, Archibald left. He complained that he had another off duty assignment. It's unclear whether he actually did, but no matter what, he was away for several hours. Was there evidence that she threatened him in the days right before October 11th? There was. He did say that she had threatened him sometime before October 8th. Now we know that the October 8th date is important because that's the date that he texted her saying good morning beautiful and asked her for a favor, which seems a bit inconsistent. But I would direct you to the trial transcripts docket entry 259 pages 220 through 222. This is where he said it was definitely before he sent those text messages. What he claims she said on that time was that if he tried to back out he would disappear. Now I don't know whether that happened or not, even if we assume that it did. I don't think that that again meant that he had no opportunity at any point to seek the and I think oh I'm sorry oh that testimony that you mentioned about going to the FBI that was during the conspiracy right that's what that was following his arrest he after his arrest he said well the statement that he made about going to the FBI he said um no I'm sorry I'm sorry I correct myself during his testimony he said that in retrospect he realized he could have gone to the FBI during his his post-arrest statement to the FBI he said he actually at the time thought of going to internal affairs but didn't at the time referring to what during the conspiracy after the September I believe after the September 28th event and then I just I would just note though the the last point is he testified that if he had been asked again he would have said no and I don't think that it is reasonable to assume that if he felt perfectly free to say no then he somehow felt like he had no option a day or a few days earlier. Let's suppose before you move on that the district court ought to have given the duress instruction here and erred legally in not giving it let's just assume that it's a debatable question but just assume it what's the consequence here is that a fatal error is he entitled to a new trial on those grounds? If the duress instruction should have been given and was not yes I think he would be really at the heart of his defense here. Yes he was entitled to have the jury the judge tell the jury this is his defense this is what the law of duress means and the failure to give it would have been fatal here. Yeah well fatal in the sense that we would be required to vacate the conviction and send it back for a new trial. Yes I mean I think it is extremely unlikely that the jury would have agreed with his duress defense given all the other evidence. But that's really not the question. Right at this stage I think we would say if that were the circumstance the duress defense should have been given he was denied the opportunity to put an affirmative defense that was his right and there would be a new trial. I would like to just very briefly in the time I have remaining address the question of entrapment specifically the supplemental instruction. First of all as we've noted in our brief I do think that this is plain error this particular challenge to the instruction was never voiced to the district court but setting that aside the usual rule is that counts are treated separately for purposes of entrapment that was set forth in this court's decision in this Nadine it was set forth in the many other decisions from other courts that we've cited. There are cases as Archibald has pointed out in which courts have said no under the circumstances it makes sense to give juries the option of finding some kind of continuing course of conduct. I would note that in none of those cases were they instructed that that was the only result they could reach. In fact that the instruction in slaughter is one where the jury was told that it could either find it could either treat them individually or as a single course. But when you look at those cases they're quite different than what we have here. Here we have two weeks before the two transactions the case agent testified that that was deliberately done because they wanted to give the conspirators an opportunity to reevaluate and think about what they were doing. The two crimes September 28th and October 11th were very different. On September 28th Archibald was guarding a shipment of cocaine on October 11th he was actually serving as the courier. There was a significant intervening event between those two things namely the meeting with Moe at which Mr. Archibald was told that he could back out and he didn't have to continue and he said that he was in 100 percent followed by do all the things that he that he did. I see that my time is up I'd be happy to ask the court to affirm. Thank you Mr. Bishop. Ms. Litwin, rebuttal. So I'll work backwards I guess starting with the supplemental and jury instruction. This is not plain error. As soon as the court the jury asked the question to the to the court the defense responded that it would like the response to be it's a little bit unclear from the record but either yes or the entrapment defense is not date specific and as soon as the judge gave this instruction that it had to look at the jury had to look at each count separately Archibald immediately objected and explained that this doesn't answer the jury's question that it doesn't clarify the issue the jury's asking which is does the entrapment defense apply to all date and counts so this flagged the issue for the court the notice requirement is not a gotcha requirement it's simply saying that the court has to be put on notice as to what's being objected to and here the court was put on notice the defendant was objecting to the instruction that the court was giving and back to what Judge Marcus had asked originally you know I'm not saying Archibald's not saying that a continuing entrapment should have been given in this case what's being objected to what was objected to and what we are saying is that the court's answer did not give the jury an option to find continuing entrapment so what the court basically told the jury is that it could not find that based upon the incidences of September 28th that he was entrapped on October 11th as the government discussed in slaughter we Archibald would have loved the instruction in slaughter to have been given where they were given the option to find continuing entrapment but the judge's answer to the jury's question a knowing the jury was confused as to the temporal time frame and then be saying to them you consider each count separately told the jury that it actually couldn't look to continuing entrapment and since there's no evidence of predisposition I'm sorry since there's no evidence of inducement after September 28th this was fatal for the jury to find him guilty to find him not guilty of entrapment on October 11th and the government also claims that there was a difference of intervening events I believe the government's discussing the isn't a dean standard which in the footnote isn't a dean claim explained that um continuing entrapment instruction would be proper and isn't a dean instruction that was given here would be wrong if the defendants were charged in a series of transactions accused of violating the same criminal statute and the evidence regarding the disposition to same for each counts but it is the same for each counts the intervening event the government discusses which is this conversation with mo in the back of the car that conversation was the government in closing said that that was how we know that on September 28th Archibald was guilty because he took the money after mo told him so to say that this is an intervening event has nothing to do with the September 28th um transaction is not true the conversation with you you cannot dispute that mo says to him in words or substance look if you don't want to be involved you don't want to have anything further to do with this that's fine and it'll be like none of this had ever happened and what does your client say in response to that that at the time mo said this to him he had already no but my question is very specific what was the response of Archibald to the statement mo had made oh your honor he said at that time i'm a hundred percent in says it twice yes your honor but at that time he had already unwittingly carried uh provided he'd already been wittedly become a drug trafficker and it was said to him not outside or in some other scenario it was said to him while he was sitting in a car with who he believed were two drug traffickers with two other drug traffickers behind him i think anybody would have said whatever the person wanted to hear at that point in time he also said to mo in that same conversation that he didn't know what he was doing at the time that Chanton Harris hadn't told him so again at that point we have to you know that was what he was stating had happened um he wasn't and he wasn't given any other opportunities after that because he was acquitted of the September 28th event so obviously the jury didn't believe that he was that he wasn't entrapped that that statement showed predisposition because then they wouldn't have acquitted him of the September 28th transaction um i see my time is up i would just like to brief to say that um as to the duress instruction um it's a it's a very um good standard for the defense which we rarely get where the evidence is viewed in the light most favorable to the defendant um and therefore we ask that the court look at that if there's no more questions thank you miss litwin mr berean thank you judge marcus i would like to go back to the question you posed to me concerning a conviction versus uh the issue being presented to the court uh prior to as to whether or not the proper remedy would be to dismiss the indictment that question was actually uh answered in in the bank of nova scotia um and what the court stated there was that the standard for determining whether the error in grand jury proceedings justifies dismissal of an indictment differs when it's considered prior to or after the conclusion of a trial in this particular case there was a conclusion of the trial so let me go to where the court discusses that the court states that after conviction dismissal of the indictment would be appropriate only where the structural protections of the grand jury have been so compromised as to render the uh the proceedings fundamental fundamentally unfair and so the question for the court would be uh what is meant by the structural protections of the grand jury and whether those structural protections have been compromised my position would be that the structural protections of the grand jury go beyond just discrimination based on race and gender but it also goes to uh the good faith of the prosecution with regard to presenting evidence before the grand jury whose duty it is to determine whether or not an individual should be indicted let me question about that and help me with this the the problem with the argument i think that you're making is it's not as if this testimony was the only testimony or the most important testimony uh as opposed to the fact that there were multiple pieces of cause altogether independently is that not relevant to determining whether the functioning of the grand jury itself has been so structurally compromised that a court ought to take what is admittedly the unusual step of not just dismissing an indictment but vacating an otherwise valid conviction based upon proof beyond a reasonable doubt just marvelous uh there were facts that came out at trial that only katina anderson was able to testify to no other witness on behalf of the government was able to testify that uh mr harris ever possessed a firearm save for the one time on that on september 28th when he was excuse me october the uh 13th when he took the level when he was at the residence of miss harris where he was of an unloaded firearm that he testified that after he left the residence he wouldn't put back inside of his vehicle there was surveillance and even the officer that was conducted the surveillance testified that he never saw mr harris in possession of a firearm so there was only evidence coming from miss anderson with excuse me yeah with from miss anderson with regard to those three counts those three counts carried 15 years there was no other evidence whatsoever that he possessed firearms on any of those occasions other than miss anderson stating that she had asked mr harris did he have possession of a firearm he would indicate yes but she never she had testified she had never seen the firearm with regard to the knowledge of what of what was contained in the containers no other witness could testify to that except for katina anderson and she even testified that she was not aware what was in the containers at the greyhound station no what was in the coolers at the at the hotels so there were no other material witnesses that could testify that mr harris was aware of what was in in those containers there was no material witness that could testify as to what uh whether mr harris ever possessed a firearm other than miss anderson and so there was no other evidence that would establish probable cause for those counts except for what came through katina anderson and i see my time is up thank you thank you judge thank you counsel we've got your case